COREY R. AMUNDSON
Chief, Public Integrity Section, U.S. Department of Justice
MARCO A. PALMIERI (D.C. Bar No. 981788)
Senior Litigation Counsel
Public Integrity Section, U.S. Department of Justice
MONA SEDKY (D.C. Bar. No. 447968; Cal. Bar No. 170147 (inactive))
Senior Trial Attorney
Computer Crime & IP Section, U.S. Department of Justice

    U.S. Department of Justice, Public Integrity Section
    1331 F Street NW
    Washington, DC 20005

    Telephone:  (202) 285-4233 (Palmieri)
               (202) 262-7122 (Sedky)
    E-mail:    marco.palmieri@usdoj.gov
             mona.sedky@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>IAN R. DIAZ,<br><br>       Defendant. | No. CR 8:21-cr-00084-JLS<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>Hearing Date: June 30, 2023<br>Hearing Time: 11:30 a.m.<br>Location:    Courtroom 8A |

    Plaintiff United States of America, by and through its counsel of record, hereby files its Sentencing Memorandum and exhibits in this matter.

    The Government's Sentencing Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 16, 2023                    Respectfully submitted,


                                            /s/Mona Sedky
                                        Mona Sedky
                                        Senior Trial Attorney
                                        Computer Crime & IP Section, U.S.
                                        Department of Justice

                                            /s/Marco A. Palmieri
                                        Marco A. Palmieri
                                        Senior Litigation Counsel
                                        Public Integrity Section, U.S.
                                        Department of Justice


                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.    INTRODUCTION.......................................... 1

II.   FACTUAL BACKGROUND.................................... 2

      A.    The Defendant's Background and Training as a
            Deputy U.S. Marshal............................ 3

      B.    Diaz and His Relationship with Hadley......... 3

      C.    The May-July 2016 Cyberstalking Scheme to Frame
            Hadley........................................ 6

      D.    Diaz's Abuse of his Position as a Deputy U.S.
            Marshal....................................... 7

      E.    Diaz Caused the Deletion of Two Email Accounts. 8

      F.    Diaz Lied While Under Oath.................... 9

      G.    Diaz's Destruction of Other Evidence and Other
            Lies......................................... 10

      H.    Hadley's Resulting Emotional Distress........ 11

III.  APPLICABLE GUIDELINES RANGE AND PRESENTENCE
      INVESTIGATION REPORT................................ 12

IV.   An Eight-Level Upward Departure is Warranted in this
      Case 16

      A.    A Four-Level Departure for Unlawful Restraint
            Should Apply................................. 16

      B.    A Two-Level Departure for Extreme Psychological
            Injury Should Apply.......................... 17

      C.    A Two-Level Departure for Extreme Conduct Should
            Apply........................................ 19

V.    An Upward Variance is also Appropriate, As An
      Alternative or as an Additional Basis to Support a
      151-188 Month Sentence............................. 20

      A.    The Nature, Circumstances, and Seriousness of
            the Offense, and the Need to Provide Just
            Punishment, Warrant an Upward Variance....... 20

      B.    The History and Characteristics of Defendant
            Support an Upward Variance................... 22

      C.    General and Specific Deterrence and the Need to
            Promote Respect for the Law also Warrant an

Upward Variance................................ 23

D.   A Significant Sentence Is Needed to Protect the
     Victims and the Public........................ 24

IV.   CONCLUSION......................................... 25

**TABLE OF AUTHORITIES**

**CASES**

*United States v. Anderson*, 5 F.3d 795, 804-805 (5th Cir. 1993).....19

*United States v. Barragan-Espinoza*, 350 F.3d 978, 982 (9th Cir. 2003)...............................................17

*United States v. Barragan-Espinoza*, 350 F.3d 978, 983 (9th Cir. 2003), as amended (Dec. 22, 2003)............................20

*United States v. Chatlin*, 51 F.3d 869, 874 (9th Cir. 1995)........19

*United States v. Edmond*, 95 F.3d 1159 (9th Cir. 1996).............19

*United States v. Greene*, 17 F. App'x 722, 725 (9th Cir. 2001)......18

*United States v. Haggard*, 41 F.3d 1320, 1324 (9th Cir. 1994).......20

*United States v. Loew*, 364 F. App'x 333, 335 (9th Cir. 2010).......18

*United States v. Loew*, 593 F.3d 1136, 1139 (9th Cir. 2010)........17

*United States v. Manuel*, 996 F.2d 1229 (9th Cir. 1993)............18

*United States v. McCraw*, 959 F.2d 242 (9th Cir. 1992).............17

*United States v. Sherwood*, 98 F.3d 402, 412 (9th Cir. 1996), as amended (Oct. 28, 1996)....................................20

*United States v. Wright*, 373 F.3d 935, 938 (9th Cir. 2004)........20

**STATUTES**

18 U.S.C. § 1519...................................................15

18 U.S.C. § 1621...................................................14

18 U.S.C. § 2261A..................................................13

18 U.S.C. § 3553...............................................15, 20

**UNITED STATES SENTENCING GUIDELINES**

USSG § 2A6.2.......................................................13

USSG § 2J1.2.......................................................15

USSG § 2J1.3.......................................................14

USSG § 3B1.1.......................................................13

USSG § 3B1.3.......................................................14

USSG § 3C1.1.............................................................14

USSG §§ 3D1.1–.5........................................................15

USSG § 5E1.2............................................................15

USSG §§ 5K2.3...............................................15, 16, 17, 18

USSG §§ 5K2.4...................................................15, 16, 17

USSG §§ 5K2.8...................................................15, 16, 19, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In 2016, the Defendant concocted and participated in an elaborate cyberstalking scheme that framed his former fiancé, Michelle Hadley ("Hadley"), for threatening and attempting to rape his then-wife Angela Connell ("Connell"). Working with Connell, the Defendant successfully deceived Anaheim Police Department ("APD") into arresting Hadley and charging her with attempted rape, among other charges. As a result of the Defendant's actions, Hadley spent 88 days in an Orange County jail for crimes she did not commit; crimes for which she faced a decades-long prison sentence.

As detailed below, the Defendant's conduct in this case was particularly abhorrent and justifies a sentence well beyond the standard guidelines range recommended by the United States Sentencing Guidelines (hereafter, "USSG" or "Guidelines"). First, the Defendant was a Deputy U.S. Marshal, a federal law enforcement officer who swore to uphold the law, but who instead used his training and experience to break the law. Indeed, as the presentence report ("PSR") demonstrates, the Defendant does not have respect for the law. *See e.g.*, PSR ¶¶51, 52, 60-68.

Second, the Defendant's objective in this case deviated from the normal threats and harassment seen in cyberstalking schemes and that are contemplated under the Guidelines. Here, the Defendant not only wanted to intimidate Hadley and silence her by having her charged with sex offense crimes, but he specifically wanted her to be restrained

1

and jailed as an intended goal of his scheme. The Defendant succeeded and caused Hadley to endure both physical and mental injuries from which she will never likely recover.

Finally, even while Hadley sat in jail, and later following her release, the Defendant took steps to obstruct justice and cover up his role in the scheme: first by wiping the contents of his phone used to perpetuate his crimes, then by deleting two personal email accounts, and again by lying during his September 2019 sworn deposition, taken as part of a civil rights lawsuit Hadley filed.

For these reasons and others discussed in more detail below, the United States recommends that this Court sentence the defendant consistent with a total offense level of 34 under the Guidelines, and to a sentence within the range of 151-188 months' imprisonment[1], plus three years' supervised release, a fine of $25,000, and a $400 special assessment.

## II. FACTUAL BACKGROUND

Following an eight-day trial, the Defendant was convicted of conspiring to cyberstalk, and of cyberstalking, Michelle Hadley, as well as of committing perjury and obstruction of justice. The Court is familiar with the Defendant and with the trial testimony and other evidence, but a summary of his conduct is highlighted here.

---

[1] Specifically, the government recommends a sentence of 60 months' imprisonment on Count One (conspiracy to cyberstalk), 60 months' imprisonment on Count Two (cyberstalking), with Counts One and Two to be served concurrently; a sentence of 31-48 months' imprisonment on Count Three (perjury); a sentence of 60 months' imprisonment on Count Four (obstruction), with Counts Three and Four to be served consecutively, for a combined sentence of 151-188 months' imprisonment.

2

### A.   The Defendant's Background and Training as a Deputy U.S. Marshal

At all relevant times, the Defendant was a Deputy U.S. Marshal ("Deputy") with the United States Marshal Service ("USMS") who was stationed in the Los Angeles County Division of the U.S. District Court in the Central District of California. PSR ¶16. As a Deputy, the Defendant received special training in conducting criminal investigations, including investigating criminal threats. PSR at ¶17. This training included surveillance techniques and cyber and internet-based queries, such as identifying email accounts and obtaining IP addresses. *Id.* Diaz received more specific computer training, including a class called "Computer Tactics." *Id.* Diaz also had experience and training in sex offender investigations and protective investigations, which included investigating harassing e-mails and stalking. *Id.* In short, Diaz had the experience and training to carry out this elaborate cyberstalking scheme because of his position as a Deputy U.S. Marshal.

### B.   Diaz and His Relationship with Hadley

Diaz also had a long history of using Craigslist personal advertisements to find sexual partners and of proposing and/or engaging in certain sexual activities relevant to the instant cyberstalking scheme, including, but not limited to, "rape fantasy" encounters. PSR at ¶ 19. Diaz brought these experiences into his relationship with Hadley when they met in the summer of 2013. In 2014 Diaz suggested to Hadley that they purchase a $470,000 condominium in Anaheim, California (the "Condo"), which was under construction and would be ready for move-in in June 2015. PSR ¶21.  Because Diaz could not contribute to

the down payment, Hadley paid the full down payment and closing costs, totaling approximately $14,000. *Id.* In December 2014, Diaz proposed marriage to Hadley and gave her an engagement ring. PSR ¶25.  They moved into the Condo in June 2015 and split the mortgage payments. *Id.* However, the relationship between Diaz and Hadley ended following a series of significant and escalating conflicts.

As Hadley testified at trial, early in their relationship and continuing throughout, conflicts arose over Diaz's sexual demands. Specifically, Diaz pressured Hadley, which she repeatedly resisted, to engage in "cuckolding"--having sex with another man--while Diaz recorded it himself while hiding in another room. PSR ¶19. Diaz told Hadley that he could arrange everything by finding a man on Craigslist and told Hadley that an ex-girlfriend had done this for him in the past. *Id.* Despite Hadley's continued refusals, Diaz persisted with his demands. In mid-February 2014, Hadley relented and agreed to have sex with a stranger arranged by Diaz. PSR ¶22.  Leading up to the event, Diaz sent Hadley links to Craigslist posts for men seeking sexual encounters. *Id.* Subsequently, Diaz arranged for a male stranger to come to Hadley's apartment, while she was intoxicated and on cold medicine. *Id.* The man had sex with Hadley, while Diaz hid in another room and recorded the sexual encounter using multiple recording devices he had set up beforehand in Hadley's bedroom. *Id.*

This February 2014 cuckolding incident was extremely traumatic for Hadley. PSR ¶23. In her view, she did not consent to the sexual encounter that Diaz had pressured her into having. *Id.* She expressed

this to Diaz the next day and many times thereafter. *Id.* She came to view this as a rape, and she asked him to never ask her to do this again. *Id.* Nevertheless, Diaz continued to ask Hadley to have sex with other men, but Hadley refused. The cuckolding incident and Diaz's recording of it, combined with Diaz's continued demands for Hadley to engage in similar activity, along with other incidents that strained their relationship, ultimately led to their eventual breakup. PSR ¶26.

In late August 2015, Hadley ended the relationship with Diaz. PSR ¶26. In early September 2015, Hadley began communicating more openly about her experiences with Diaz—both to Diaz himself and to others. PSR ¶27. For example, Hadley notified her graduate school personnel about her concerns about Diaz, who in turn notified Diaz that he was not allowed on campus. *Id.* On September 10, 2015, Hadley sent another email to Diaz from her verified Gmail account, which referred to the rape incident and accused Diaz of being unfaithful during their relationship. PSR ¶28. In the text of this email, Hadley included biblical references and a specific reference to "Lillith." The language used in this latter email was out-of-character for Hadley and, in her view, resulted from her having a post-traumatic stress episode resulting from her relationship with Diaz. *Id.* Hadley was candid with Diaz and others about her mental health struggles resulting from her being in an abusive relationship with Diaz. PSR ¶29. The next day, on September 11, 2015, in the first of a series of events of Diaz attempting to exploit the courts and local law enforcement, Diaz filed an application for a Temporary Restraining Order ("TRO") against

Hadley, attaching several of the e-mails. The TRO was denied. PSR ¶30. At or around the same time, Diaz also complained to APD that Hadley was harassing him and that he wanted her prosecuted. *Id.* APD informed Diaz that no crime had been committed. *Id.*

As noted, Hadley moved out of the Condo in late August 2015, just a few months after Diaz and she had moved in together. From September-October 2015, Hadley attempted to resolve the transfer of the Condo's ownership to Diaz. PSR ¶32. When a resolution could not be reached, Hadley hired property attorneys, who negotiated a settlement agreement. *Id.* Diaz did not honor the negotiated agreement, and a legal dispute ensued that ultimately resulted in Hadley's filing a formal civil lawsuit for Diaz's breach of the property agreement. PSR ¶33.

### C.    The May-July 2016 Cyberstalking Scheme to Frame Hadley

As the Condo dispute wore on, although Diaz was eager to remain in the Condo, he could not afford to do so. PSR ¶34. Diaz was also growing troubled by Hadley's increasingly public accusations that Diaz had raped and abused her. *Id.* It was at this time, in January 2016, that Diaz began dating Connell. PSR ¶35. Within a few weeks of meeting Connell, Diaz proposed marriage. *Id.* Shortly thereafter, they married and Connell moved into the Condo that was the subject of his ongoing property dispute with Hadley. *Id.* Against this backdrop, Diaz and Connell initiated, and then executed, a complex cyberstalking scheme with the objective of framing Hadley for criminal conduct that Diaz and Connell perpetrated against themselves. *Id.*

To harass and intimidate Hadley, in part to thwart potential litigation initiated by her related to the sale of the Condo and to silence her accusations, Connell and Diaz: (1) posed as Hadley using fake email accounts and sent harassing and threatening emails to themselves, with horrific photographs attached; (2) posed as Hadley and used Craigslist to solicit men for (purportedly) non-consensual "rape fantasies" that targeted Connell; (3) staged an attempted sexual assault on Connell; (4) falsely reported to APD that Hadley was responsible for the threatening and harassing conduct; (5) pressured APD officials to arrest Hadley by continuing to file false police reports and complaining to APD that Hadley posed a serious and imminent danger to them; and (6) ultimately caused local authorities to charge Hadley with, among other crimes, multiple counts of attempted rape and detain Hadley in jail for approximately 88 days. PSR ¶36.

**D.   Diaz's Abuse of his Position as a Deputy U.S. Marshal**

Throughout this scheme, the Defendant repeatedly leveraged his position as a Deputy U.S. Marshal to convince APD of the danger Hadley supposedly posed to Connell. PSR ¶60. For example, when officers responded to the Condo on June 13, 2016, Diaz was out front with his law enforcement badge around his neck and his weapon drawn. PSR ¶61. Diaz frequently mentioned to responding officers that he was a Deputy U.S. Marshal and had expertise in investigating threats. *Id*. As another example, Diaz declared to responding APD officers, "[I] work on judicial threats, threats to judges, threats to prosecutors. And we

have seen some really sick shit. Nothing like this. Nothing like this." PSR ¶62.

Diaz also repeatedly used his U.S. Department of Justice email account and cell phone number to communicate with APD about the supposed threats. PSR ¶62. In another instance, when officers arrived on scene at the Condo, Diaz had what appeared to be an automatic-style assault rifle plainly visible on the tabletop. PSR ¶63. Diaz repeatedly warned APD that he could have and/or almost shot the Craigslist men, further increasing the pressure for APD to arrest and charge Hadley. PSR ¶64. As a result of Diaz's constant references to his law enforcement officer position—and his apparent willingness to use his firearm—APD arrested Hadley, not only to protect Connell from a sexual assault, but also to avoid an accidental officer-involved shooting. PSR ¶65.

### E.    Diaz Caused the Deletion of Two Email Accounts

At trial, Diaz was convicted of obstructing an Internal Affairs investigation by deleting two personal email accounts. As background, on June 6, 2016, Hadley's father, Michael Hadley, emailed USMS-Internal Affairs to report that his daughter was receiving suspicious emails from unknown email accounts, including those used in the scheme by Diaz and Connell to falsely arrest Hadley, and further informed USMS-Internal Affairs that Hadley and Diaz were going through a property dispute. PSR ¶89. After that first email, Hadley sent three additional emails to USMS-Internal Affairs, which were added to an open case file. PSR ¶90.

On June 27, 2016, Diaz contacted Senior Inspector Christy Parker ("Parker"), who had taken the initial complaint from Michael Hadley and the subsequent complaints from Michelle Hadley. PSR ¶91. In his email, Diaz asked Parker to forward any emails she had received from "non-USMS personnel, namely 'Michelle Hadley' or a 'Lilith Hadley[.]'" *Id.* At trial, Parker described this email as "inappropriate." *Id.*

Even though Diaz knew there was an open investigation into Hadley's complaints, on August 3, 2016, he caused the deletion of his personal email account irishcloud@me.com, an account he used to communicate with APD Detective Michael Cunha and forward emails he purported to have received from Hadley, Lilithistruth, and other fake accounts. PSR¶92. On December 20, 2016, Diaz also disabled his northoflightsend@gmail.com personal email account, the account associated with his Apple ID and the account he used to communicate with one of the Craigslist rape fantasy posters involved in the scheme. PSR ¶93.

### F.   Diaz Lied While Under Oath

Diaz lied while under oath at his civil deposition about, *inter alia*, accessing Connell's email account. PSR ¶82. When Diaz was asked if he ever accessed Connell's accounts or sent emails from her accounts, Diaz unequivocally answered no. PSR ¶83. He went one step further, clarifying: "I would forward e-mails that she had already forwarded to me." PSR ¶84. In fact, Diaz forwarded approximately twenty emails to APD from Connell's account as part of the scheme. PSR ¶85. Diaz identified himself in only three of those emails. *Id.* In the other

emails, Diaz impersonated Connell, pretended to be afraid of Hadley, and advocated for Hadley's arrest. *Id.* Diaz also accessed Connell's iCloud account 37 times while at work during the duration of the scheme. PSR ¶86.

### G.   Diaz's Destruction of Other Evidence and Other Lies

Although not the basis of any criminal charges, Diaz destroyed additional evidence and told countless lies throughout the scheme. For example, on September 30, 2016, Detective Cunha interviewed Diaz as part of his investigation. During this interview, Cunha confronted Diaz regarding evidence linking Diaz to the cyberstalking conspiracy. PSR ¶94. Diaz denied involvement in the scheme and deflected blame to Connell. *Id.* Following that interview, Cunha asked Diaz for his phone and laptop and his consent to search them, which Diaz provided. PSR ¶94.

While APD was able to take an image of Diaz's laptop, APD encountered technical problems with APD's Cellebrite software and could not download Diaz's phone. PSR ¶95. Later that same night (mere "hours" as estimated by Cunha), APD returned the phone to Diaz before APD could successfully download it. PSR ¶96. APD did so because Diaz repeatedly demanded that his phone be returned. *Id.* Before returning Diaz's phone, Cunha notified Diaz that APD would need additional time in the future to complete the download of Diaz's phone. PSR ¶97. However, when Cunha followed up later to obtain the phone to image it, Diaz informed Cunha that he had wiped the phone's contents and gave the phone to his mother. *Id.* As proven at trial, by that point, Diaz had already used military-

grade phone deletion software to selectively delete incriminating evidence from his phone.

To conceal his role in the scheme, Diaz also lied during his deposition in the subsequent civil lawsuit. PSR ¶ 88. Specifically, Diaz lied about accessing Connell's accounts as detailed above but also about his use of Craigslist. Diaz was asked if he ever used Craigslist for anything besides selling a bike or for posting ads, and he responded: "Not that I remember[.]" *Id.* He was further asked if he remembered posting ads on Craigslist and Diaz responded "No." *Id.* Lastly, when specifically asked if he had used Craigslist to respond to profiles or ads for sexual encounters, Diaz responded: "I don't remember. I don't think so." *Id.* In fact, as proven at trial, Diaz used Craigslist extensively. PSR ¶88 (detailing evidence demonstrating Diaz's prior use of Craigslist, including testimony from prior sexual partners that Diaz used Craigslist to search for, and arrange, third-party sexual partners).

**H.    Hadley's Resulting Emotional Distress**

As a result of Diaz and Connell's cyberstalking campaign, Hadley was falsely accused of committing serious crimes, arrested twice, and detained in custody for 88 days. PSR ¶102. During her unlawful detention, Hadley was assigned to the jail's high security unit and labeled an R3, or a "Romeo." *Id.* Many R3 inmates are accused of child molestation, child sex abuse, and other sex crimes. *Id.* While in custody, Hadley developed an (undeserved) reputation for being an informant, and other inmates would physically abuse her, including in

11

one incident slamming her into cell walls. *Id.* Hadley was allowed out of her cell for only one hour a day, plus one hour for weekend visitors. *Id.*

There is no question that Hadley suffered extreme psychological injury as a direct result of Diaz's criminal conduct. *Id.* For example, in the immediate aftermath of her false imprisonment, Hadley could not sleep, suffered from nightmares, paranoia, and anxiety. *Id.* She constantly feared police would re-arrest her or that Diaz would hurt her. *Id.*

However, as detailed in the attached Victim Impact Statement from Hadley, attached hereto as Exhibit A, and a letter to the Court submitted by Hadley's mother, attached hereto as Exhibit B, Michelle Hadley's injuries go well beyond the forgoing immediate trauma she suffered. Indeed, in addition to managing the effects of her Post Traumatic Stress Disorder (PTSD), Ms. Hadley, who lost her job, home, and graduate school scholarship, had to further uproot her life and move away from her family to escape the unwanted notoriety brought upon her by Diaz and Connell. Ex. A, at 3-4. If anything is clear from Michelle and Suzanne Hadley's submissions to this Court, it is that Michelle Hadley and her family will never be the same again as a consequence of Ian Diaz's criminal conduct.

III. APPLICABLE GUIDELINES RANGE AND PRESENTENCE INVESTIGATION REPORT

For his conduct, the defendant was charged in a four-count Superseding Indictment. Dkt. 28. On March 23, 2023, the defendant was convicted after a jury trial on all four counts. Dkt. 233. On May

12

30, 2023, the USPO issued the Presentence Investigation Report ("PSR") and its recommendation letter.  Dkt. 255 (Recommendation Letter).

The USPO determined that, prior to any departure or variance considerations, defendant's Total Offense Level was 26, based on the following calculations:

**Convictions on Counts One and Two:**

   **Base Offense Level**

     18 U.S.C. § 2261A(2)(B):        18        USSG § 2A6.2(a)

   **Specific Offense Characteristics:**

     Pattern of Activity Involving   +2   USSG § 2A6.2(b)(1)(E)
     Stalking, Threatening Same
     Victim

   **Role in the Offense:**

     Organizer, leader          +2       USSG § 3B1.1(c)[2]

---

[2]   The defendant was clearly "an organizer, leader, manager, or supervisor in any criminal activity."  USSG § 3B1.1(c).  Although Connell did not testify at trial, she nevertheless stated during her voluntary interviews with law enforcement that Diaz devised the scheme to frame Jane Doe and directed Connell's participation in it. This proposition is evident, even without considering Connell's statement, and substantiated by the evidence the Court observed during trial. Specifically, the evidence at trial established that Diaz, not Connell, had the primary motives to cyberstalk Hadley - i.e., Hadley terminated their tumultuous relationship, was his opponent in their litigation over the Condo, and was becoming more vocal in accusing Diaz of being a cheater, abuser, and rapist. Furthermore, Diaz, not Connell, had the prior experience using Craigslist personals to find strange men for third party sexual encounters.  Throughout the scheme, Diaz accessed Connell's electronic devices and online accounts, not vice versa. Finally, as the body worn camera evidence played during trial showed, Diaz repeatedly led the interactions between Connell and Diaz and APD. Diaz further directed Connell in her specific interactions with APD going so far in one instance to "correct" her word choice, and coached her behind closed doors to change her narrative. *See* GXs 627-628.

| | | |
|---|---|---|
| Abuse of trust, special skill | +2 | USSG § 3B1.3[3] |
| **Obstructing or Impeding Justice:** | <u>+2</u> | USSG § 3C1.1[4] |
| **Total Offense Level:** | **26** | **78-97 months** |

**<u>Conviction on Count Three</u>**

   **Base Offense Level**

| | | |
|---|---|---|
| 18 U.S.C. § 1621 | 14 | USSG § 2J1.3 |
| **Total Offense Level:** | **14** | **15-21 months** |

**<u>Conviction on Count Four</u>**

---

[3]   As noted above, Diaz abused his position as a Deputy to commit and conceal his offenses. *See supra*, Section II. A and II.D. Diaz repeatedly touted to APD his status as a Deputy U.S. Marshal to convince them that Hadley was responsible and that she was especially dangerous. *See e.g.*, GX 622. Diaz also used his "special" skills to carry out and conceal his involvement in the scheme. As the evidence at trial established, one of his primary job responsibilities was to investigate threats against the judiciary and others, including by conducting cyber investigations into online threats.  Diaz used these and other skills in the scheme, including the use of encrypted communications platforms like Wickr and protonmail, encrypted electronic devices, and military grade software to selectively wipe files from his cell phone.

[4]   The evidence at trial overwhelmingly established that Diaz "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. . ." USSG § 3C1.1. "Covered conduct" includes: "destroying or concealing evidence," "providing materially false information to a judge," and providing a "materially false statement to a law enforcement officer. . ." USSG § 3C1.1 Commentary (Application Notes 4(B), (D), (F), (G)). Diaz engaged in all the forgoing activity. For example, putting aside the counts of conviction, Diaz destroyed and concealed evidence by changing his cell phone number twice (in one instance, one day after he used it to authorize a Craigslist rape fantasy post); he purchased military grade software to wipe data from his cell phone and then gave his phone to his mother; and Diaz repeatedly lied to APD and lied during his civil deposition about his use of Craigslist, among many other topics. Finally, contrary to defendant's recently filed pleading, USSG § 3C1.1 specifically allows for this enhancement to be applied even if the defendant is convicted on separate counts of obstruction. *See* § 3C1.1, Note 8.

**Base Offense Level**

18 U.S.C. § 1519                14                USSG § 2J1.2

**Total Offense Level:**             **14**           **21-27 months**

**Combined Offense Level:**          **26**         **USSG §§ 3D1.1-.5**

The USPO's calculations also result in no additional adjustments following a grouping analysis. *See* PSR ¶¶ 154-157.

The government agrees with USPO's calculations prior to applying any upward departures or variance factors. However, for the reasons discussed below, the government submits that application of departure provisions USSG §§ 5K2.4 (Unlawful Restraint); 5K2.3 (Extreme Psychological Injury); and 5K2.8 (Extreme Conduct) warrant an eight-level upward departure of the Defendant's calculated guidelines. Moreover, the government agrees with USPO's recommendation that, pursuant to 18 U.S.C. § 3553(a), an upward variance is warranted in this case. Dkt. 255 at 8-9. Accordingly, the government respectfully recommends a sentence consistent with a total offense level of 34, and that Diaz be sentenced within the range of 151-188 months' imprisonment, plus three years' supervised release, a fine of $25,000,[5] a $400 special assessment, as well as the computer restrictions and additional conditions recommended by the USPO. Dkt. 255 at 1-4.

---

[5] The applicable fine range for the offenses of conviction is $25,000 to $250,000. PSR ¶ 290; USSG § 5E1.2(c)(3). The government agrees that a $25,000 fine, to be paid no later than 90 days after judgment, is appropriate in this case. Dkt. 255 at 1.

**IV.   An Eight-Level Upward Departure is Warranted in this Case**

For the reasons discussed below, the government submits that departure provisions USSG §§ 5K2.4 (Unlawful Restraint), 5K2.3 (Extreme Psychological Injury), and 5K2.8 (Extreme Conduct), are applicable to this case and warrant a total eight-level upward departure of the Defendant's calculated guidelines to an adjusted offense level of 34 under the USSG.

**A.   A Four-Level Departure for Unlawful Restraint Should Apply**

USSG § 5K2.4 provides that a court may depart upward if a person was "abducted, taken hostage, *or unlawfully restrained to facilitate the commission of the offense...*". (emphasis added). Here, there can be no dispute that Michelle Hadley was unlawfully restrained given her 88-day false imprisonment in an Orange County jail.   Moreover, her detention was not only perpetrated to facilitate Diaz's crimes, but it was one of his ultimate objectives.   Indeed, in the following interactions with APD captured on body worn cameras (BWC), some of which were admitted during trial, the Defendant made his goals well-known to the police:

- Diaz demanded to be notified by Detective Lomeli when Michelle Hadley will be "put in handcuffs." GX 623, 3:10-3:15.

- Diaz states that Hadley "needs to be in fucking cuffs and in a padded room." GX 623, 26:00-26:03.

- Diaz states "At what point does this girl get arrested for sending this shit. . . I'm just curious." GX 625,[6] 3:08-3:17.

- After Mr. Diaz is informed that Michelle Hadley will be arrested for a felony that includes a sex offender registration

---

[6]   The government proffers the evidence referenced herein from GX 624 and GX 625, which were not admitted at trial. The government will have the BWC excerpts referenced herein available to play for the Court at the June 30, 2023, hearing.

16

requirement, he pumps his fist in the air and states "Fuck yeah, that's all I give a shit about." GX 624, 1:18-1:23.

Because the unlawful restraint of Michelle Hadley was not only utilized during the commission of the Defendant's crimes, but was its horrific aim, the government submits a four-level upward departure is warranted in this case and is consistent with applicable precedent. Here, causing Hadley's physical restraint was a tactic by which Diaz caused her to suffer substantial emotional distress, one of the elements of cyberstalking. *See United States v. McCraw*, 959 F.2d 242 (9th Cir. 1992) (Court upheld four-level increase due to victim being restrained for two days during commission of a bank robbery); *United States v. Barragan-Espinoza*, 350 F.3d 978, 982 (9th Cir. 2003) (in drug distribution conspiracy, three-level upward departure under § 5K2.4 was not erroneous where district court found defendant held victim against her will and forced her to carry drugs in her bra, conduct that was not alleged in or directly related to, charges in the indictment); *United States v. Loew*, 593 F.3d 1136, 1139 (9th Cir. 2010) (in a stalking case, district court properly applied two-level upward departure as result of victim being physically restrained during the stalking scheme).

**B.  A Two-Level Departure for Extreme Psychological Injury Should Apply**

USSG § 5K2.3 provides for an upward departure where a victim "suffered psychological injury much more serious than that normally resulting from commission of the offense." Moreover, the extent of the increase is a factor of the "severity of the psychological injury and the extent to which the injury was intended or knowingly risked." USSG § 5K2.3. Finally, § 5K2.3 states that, under normal circumstances, application of the departure is appropriate "when there is a

17

substantial impairment of the intellectual, psychological, emotional, and behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns." *Id*.

As detailed *supra*, Michelle Hadley's psychological injuries, including the effects of PTSD, sleep deprivation, nightmares, paranoia, and severe anxiety, amongst other effects, were substantially debilitating, had a lasting impact on Ms. Hadley's life, and manifested themselves in myriad physical and psychological symptoms. *See e.g.*, Ex. A, at 3-4 (following her incarceration, Ms. Hadley's PTSD impacted her ability to focus on schoolwork and unexpected rings at the door caused her to "break down in panic, [her] whole body shaking uncontrollably."). Finally, the government submits that the injuries suffered by Ms. Hadley as the result of her 88-day incarceration—which is not a normal consequence of cyberstalking—are "more serious than that normally resulting from commission of the offense." USSG § 5K2.3. Accordingly, the government submits a two-level upward departure pursuant to USSG § 5K2.3 is warranted in this case, and consistent with applicable precedent. *See United States v. Manuel*, 996 F.2d 1229 (9th Cir. 1993) (district court properly departed upward four levels, pursuant to USSG § 5K2.3, for severe psychological injury to the victim, where Court found victim has regular and recurring nightmares about a brutal assault by defendant); *United States v. Loew*, 364 F. App'x 333, 335 (9th Cir. 2010) (in a stalking case, district court gave valid reasons for its two-level upward departure in calculating defendant's offense level, which included extreme psychological injury to the victim); *United States v. Greene*, 17 F. App'x 722, 725 (9th Cir. 2001)

(affirming two-level upward departure in wire fraud case due to the psychological harm caused to the victims); *United States v. Edmond*, 95 F.3d 1159 (9th Cir. 1996) (court properly applied a two-level upward departure where the victim testified that they suffered recurring nightmares of the crime and changed their career and living choices as a consequence of the crimes committed against them); *see also United States v. Anderson*, 5 F.3d 795, 804-805 (5th Cir. 1993) (upholding an upward departure on the basis of extreme psychological injury when the evidence presented in support of the enhancement was a letter from the victim describing "substantial changes in [her] psychological and behavioral functioning") (cited with approval by *United States v. Chatlin*, 51 F.3d 869, 874 (9th Cir. 1995)).

C.   **A Two-Level Departure for Extreme Conduct Should Apply**

USSG § 5K2.8 provides that if "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the Court may increase the sentence above the guideline range to reflect the nature of the conduct." Examples of such conduct include gratuitous infliction of injury or the prolonging of pain or humiliation suffered by the victim. *See* USSG Primer on Departures & Variances, *available at* https://www.ussc.gov/sites/default/files/pdf/training/primers/2022_Primer_Departure_Variance.pdf, fn. 131 (citing cases).

Here, the ultimate objective of Diaz's and Connell's cyberstalking scheme—to have Hadley falsely arrested and then imprisoned—is uniquely degrading to any reasonable person, if not heinous and cruel in itself. Moreover, the evidence presented at trial also shows that after successfully carrying out his scheme to have Michelle Hadley falsely detained, Diaz prolonged Hadley's pain and humiliation by waiting months–and until he could conceal his involvement in the scheme–to come

forward with information that Hadley was innocent. Accordingly, the government submits Diaz's conduct was extreme in this case, and a two-level upward departure is warranted and consistent with applicable precedent. *See United States v. Barragan-Espinoza*, 350 F.3d 978, 983 (9th Cir. 2003), as amended (Dec. 22, 2003) (Barragan-Espinoza's conduct was "unusually heinous, cruel, and brutal" and warranted a three-level upward departure under § 5K2.8); *United States v. Haggard*, 41 F.3d 1320, 1324 (9th Cir. 1994) (upholding a one-level increase under section 5K2.8 where defendant was convicted of obstruction of justice); *United States v. Wright*, 373 F.3d 935, 938 (9th Cir. 2004) (a four-level upward departure under USSG § 5K2.8 for extreme conduct); *United States v. Sherwood*, 98 F.3d 402, 412 (9th Cir. 1996), as amended (Oct. 28, 1996) (The District Court correctly concluded that to be forced to disrobe with the threat of publication of photographs was "unusually degrading" within the meaning of § 5K2.8 and upheld a two-level upward departure on these grounds).

## V. An Upward Variance is also Appropriate, As An Alternative or as an Additional Basis, to Support a 151-188 Month Sentence

The Government agrees with the USPO that a variance is appropriate in this case and submits that, either in addition to, or in the alternative, a sentencing range of 151-188 months' imprisonment is supported by an upward variance based on the factors set forth in § 3553(a).  Those factors are discussed in more detail below.

### A. The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment, Warrant an Upward Variance

Many aspects of Diaz's cyberstalking campaign are particularly disturbing, including its persistence, its escalation over time, the great lengths Diaz went to conceal his role, the amount of people Diaz

put in harm's way, and the significant injury that he caused. As described above, over a two-month period, Diaz and Connell engaged in a multi-faceted campaign to terrorize Hadley, a woman Diaz once claimed to love.  In the dozens of communications, fraudulent TRO applications, and false police reports, Diaz and Connell spread vicious and destructive lies about Hadley, making it appear as if she was emotionally unstable, vindictive, and dangerous.

The campaign was as malicious in its aim as it was persistent in its execution.  Whenever a stage in the scheme failed to elicit the response Diaz wanted from APD, Diaz and Connell escalated their campaign to frame Hadley for more crimes she did not commit. This resulted in putting even more people in harm's way. For example, after setting up fake accounts and sending fake emails and fraudulently obtaining TROs, Diaz and Connell turned to Craigslist.  Posing as Hadley, Diaz and Connell convinced multiple unsuspecting men to come to the Condo and, despite knowing these men were innocent of any wrongdoing, Diaz and Connell reported to APD that these men were trying to rape Connell, running the risk of these innocent men being injured in a police conflict.

Diaz and Connell did not stop there. Connell reported to APD that she had been sexually assaulted, which resulted in APD arresting Hadley for the first time. Because Hadley was released the next day, Diaz and Connell escalated their actions.  This time they posted their own advertisements on Craigslist and successfully lured a 17-year-old boy to the Condo.  Although this boy had done nothing wrong, he was detained

21

and questioned by APD. As a result, Hadley was arrested for the second time, where she was detained for 88 days. For that entire time, Diaz knew Hadley was innocent; he knew that Hadley was being detained for crimes she did not commit; and despite this, Diaz did nothing to clear Hadley's name. Only once Diaz recognized his scheme was beginning to unravel, and he had the time to conceal his involvement, did he blame Connell to APD, distancing himself from the criminal conduct in the process. While deflecting blame onto Connell, Diaz lied, deleted evidence, and obstructed justice, which only further delayed Hadley's release from jail.

**B. The History and Characteristics of Defendant Support an Upward Variance**

Diaz has proven that he is an out-of-control cyber predator who was hell-bent on ruining Hadley's life and did so wearing the badge of a Deputy U.S. Marshal.  Diaz knew that he was hurting Hadley and delighted in doing so, as evidenced by his repeated efforts to encourage APD to arrest Hadley, and the enjoyment he expressed on the BWC when APD explained that Hadley was going to be arrested, charged with sex crimes, and put on the sex offender registry.

Diaz's reckless disregard for Hadley and others is displayed in how his crimes grew bolder over time—evolving from sending threatening emails to luring innocent bystanders into his scheme. Diaz then took additional measures to hide his identity, including using VPNs, changing cell phone numbers, accessing and using Connell's accounts, posing as Connell, and deleting evidence.  He did so even though he

was a federal law enforcement officer, who knew right from wrong, and exploited his training to terrorize Michelle Hadley even while having a greater understanding of the likely consequences that he could face. Indeed, no fear of imprisonment or other consequence curbed Diaz's insatiable appetite to punish Hadley.

**C.  General and Specific Deterrence and the Need to Promote Respect for the Law also Warrant an Upward Variance**

A significant sentence is needed to promote Diaz's respect for the law.  Diaz has repeatedly shown a total disregard for the law, despite the fact that he was a federal law enforcement officer.  As noted above, he repeatedly filed, and assisted Connell in filing, fraudulent TRO applications and false police reports.  Diaz repeatedly lied to law enforcement officers when they interviewed him and unabashedly used his status as a Deputy U.S. Marshal to lend credence to his lies.  As referenced *supra*, Diaz declared to APD officers, "[I] work on judicial threats, threats to judges, threats to prosecutors. And we have seen some really sick shit. Nothing like this. Nothing like this." PSR ¶ 63. It is in this same conversation with APD officers where Diaz went on to say that Hadley "needs to be in fucking cuffs and a padded room." *Id.*

When confronted by Detective Cunha, Diaz denied involvement in the scheme, deflected blame to Connell, and destroyed evidence. Moreover, Diaz continued his flagrant disregard for the law by perjuring himself in the federal civil suit. Indeed, the evidence at trial clearly showed that Diaz lied multiple times in his deposition when asked about his prior use of Craigslist and whether he accessed Connell's accounts.

Furthermore, a significant sentence is needed to send an important deterrence message to both Diaz and other cyberstalkers or would-be cyberstalkers. These cyber predators presumably believe that, because they are hiding behind their computers and VPNs, it is much less likely that they will be detected and held accountable for their crimes. Some might even mistakenly believe that cyberstalking is not a serious crime.

Similarly, it is important to send the message to Diaz and other law enforcement officers that they cannot abuse their position, hide behind their badges, or take advantage of their training and experience to perpetuate and hide criminal conduct. Indeed, a message should be sent to any law enforcement officers who mistakenly believe that their position and their badge entitle them to special treatment or that they may engage in criminal conduct with impunity.

The government respectfully submits that a guideline sentence, in a case as egregious as this one, would not serve as an effective deterrence—especially after Hadley spent 88 days in jail for crimes she did not commit. Such a sentence would pose a serious risk that cyberstalkers and law enforcement officers will, in the future, engage in a cost-benefit analysis and continue to commit similar criminal conduct undeterred.

**D.   A Significant Sentence Is Needed to Protect the Victims and the Public**

A sentence in the range of 151-188 months is needed to protect Hadley and others from Diaz. Diaz committed his criminal conduct with the "push of a button," often using a small, handheld electronic device that is easy to conceal and he did so often while at work, using DOJ devices. It is clear Diaz is particularly adept at masking his identify

24

and concealing his actions. He has shown a willingness to use his law enforcement training and background to his advantage, concealing his criminal conduct and falsely implicating others, which would make monitoring Diaz and protecting Hadley and the public extremely difficult.

## IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Diaz to a term of imprisonment of not less than 151 months but no more than 188 months.  This recommended sentence reflects the seriousness of defendant's crimes and his history and characteristics, coupled with the profound need to protect the public, promote respect for the rule of law, and afford adequate deterrence to the defendant, law enforcement officers who would advantage of their position, and other would-be cyberstalkers.

Dated: June 16, 2023

Respectfully submitted,

_____/s/Mona Sedky_____
Mona Sedky
Senior Trial Attorney
Computer Crime & IP Section, U.S.
Department of Justice

_____/s/Marco A. Palmieri_____
Marco A. Palmieri
Senior Litigation Counsel
Public Integrity Section, U.S.
Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA